UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN COFFMAN, et al.,

    Plaintiffs,

v.                                                  CASE NO. 8:17-cv-201-T-23CPT

UNIGROUP, INC., et al.,

    Defendants.
_____/

## **ORDER**

Alleging that their employers failed to pay the minimum wage required by the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 216(b), John Coffman and David Lesperance sue (Doc. 19) Unigroup and two Unigroup subsidiaries, Mayflower Transit and United Van Lines. The defendants move (Doc. 113) for summary judgment, and the plaintiffs oppose (Doc. 114).

## **BACKGROUND**

Under 49 U.S.C. §§ 13102 and 13901, a "motor carrier," defined as a person using a motor vehicle to provide services related to the movement of passengers or property, must register with the Federal Motor Carrier Safety Administration. Section 13902 establishes the requirements governing the FMCSA's issuing that registration, called an "operating authority." Further, Section 13905(d) permits the FMCSA to suspend or revoke an operating authority. To maintain operating authority — and continue to transport customers' property — a motor carrier must demonstrate "willingness and ability" to comply with the federal trucking

regulations, which include commercial driver's license requirements;[1] record-keeping requirements;[2] rules for operating a commercial motor vehicle;[3] restrictions on hours of service;[4] and rules for inspecting, repairing, and maintaining a commercial motor vehicle.[5]

To balance the administrative cost of acquiring and maintaining an operating authority on one hand with the expense of purchasing, maintaining, and operating a truck on the other hand, the trucking industry has developed a practice of "leasing."[6] A "lease," according to 49 C.F.R. § 376.2(e), is a "contract or arrangement in which the owner [of a motor vehicle] grants the use of [the motor vehicle] . . . for a specified period of time to a [motor carrier possessing operating authority] for use in the regulated transportation of property, in exchange for compensation." In other words, an "independent owner-operator"[7] can lease a truck to a motor carrier, and the motor

---

[1] 49 C.F.R. § 383.

[2] 49 C.F.R. § 390.

[3] 49 C.F.R. § 392.

[4] 49 C.F.R. § 395.

[5] 49 C.F.R. § 396.

[6] *See generally*, Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115, 118–136 (2008) (describing the evolution of federal trucking regulation and the practice of "leasing" in the trucking industry).

[7] "Operator" is an industry term for truck driver. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Inway, Inc.*, No. 3:02-cv-1005-J-25-MCR, 2007 WL 958284, at *1 (M.D. Fla. Mar. 29, 2007) (Adams, J.).

carrier can allow that operator to transport property under the motor carrier's operating authority.

The plaintiffs are "independent owner-operators." (Doc. 19 at ¶ 5) The defendants are two motor carriers (Mayflower and United) — also called "household-goods carriers," "van lines," or "moving companies" — and their parent company (Unigroup). (Doc. 19 at ¶¶ 2, 29, 32–34; Doc. 113-2 at ¶¶ 3–4; Doc. 128-1 at 3)[8] Both Mayflower and United possess an operating authority. (Doc. 113-2 at ¶¶ 4, 12, 13; Doc. 128-1 at 10–11, 23)

Between the plaintiffs and the defendants stood three middlemen: McCollister's Transportation Systems, Hilldrup Transfer and Storage, and Planes Moving & Storage of Indianapolis. These "Agents," who are not parties in this action, are independently owned moving companies.[9]

The defendants entered an "Agency Agreement" with each Agent. Each Agency Agreement authorizes the Agent to "provide transportation services for [the defendants] in interstate commerce and do so under the [defendants'] federal [operating] authorities." (Doc. 113-2 at ¶ 5) Further, each Agency Agreement renders the Agent "responsible for providing all transportation services related to the

---

[8] In this order, page citations refer to the page number in the banner atop each page, not to the deposition page number.

[9] The plaintiffs allege in the complaint (Doc. 19 at ¶ 3) and emphasize in their response (Doc. 114 at 3) that the Agents hold a large ownership stake in Unigroup.

shipment of household goods, including providing van operators to perform driving and moving services." (Doc. 113-2 at ¶ 6)

In accord with "Independent Contractor Operating Agreements" (ICOAs), both plaintiffs operated their trucks for an Agent. David Lesperance agreed to an ICOA with McCollister's (Doc. 113-5), and John Coffman agreed to an ICOA with Hilldrup (Doc. 113-7) and another ICOA with Planes (Doc. 113-8). Under the McCollister's-Lesperance ICOA, Lesperance agreed to lease his truck to McCollister's. (Doc. 113-5 at 5; Doc. 136-2 at 10) Although the Hilldrup-Coffman ICOA includes a leasing term that is identical to the leasing term in the McCollister's-Lesperance ICOA, Coffman denies having leased his truck to Hilldrup. (Doc. 136-1 at 38) Coffman testifies that Planes purchased his truck. (Doc. 136-1 at 60–62)

Ultimately, the plaintiffs and the defendants lacked a contract with each other. Under the ICOAs, the plaintiffs "leased" their trucks to, and provided moving services for, the Agents. And in accord with the Agency Agreements, the defendants authorized the Agents to transport household goods under the defendants' operating authorities. By virtue of these engagements — between the plaintiffs and the Agents and between the Agents and the defendants — the plaintiffs transported customers' household goods under the defendants' operating authorities.

## DISCUSSION

Under 29 U.S.C. § 206, the FLSA protects workers by obligating "employers" to pay "employees" a minimum wage. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). Section 216(b) creates a private right of action for an "employee" of an "employer" who fails to pay a minimum wage. A plaintiff who alleges that a defendant failed to pay a minimum wage bears the burden of proving an employee-employer relation between the parties. *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)) ("[The defendant] correctly points out that the [plaintiff] has the burden of proof on the threshold issue of whether an employer-employee relationship exists with regard to the activities in question"); *Freeman v. Key Largo Vol. Fire & Rescue Dept., Inc.*, 841 F. Supp. 2d 1274, 1278 (S.D. Fla. 2012) (King, J.) ("individuals seeking compensation pursuant to the FLSA bear the initial burden of proving that an employer-employee relationship exists") (citation and quotations omitted).

The FLSA defines particularly "employee" and "employer," and the FLSA's protection extends only to an "employee" working for an "employer." *Scantland*, 721 F.3d at 1311. Section 203(e)(1) defines an "employee" as "any individual employed by an employer," and Section 203(d) explains that "[e]mployer includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." "Employ," according to Section 203(g), means "to suffer or permit to work."

Although broad, these definitions are not broad enough to permit an independent contractor to enjoy the FLSA's protections. *Scantland*, 721 F.3d at 1311 (citing *Rutherford Food*, 331 U.S. at 788–89).

Moving for summary judgment, the defendants argue that the plaintiffs were independent contractors who lacked entitlement to a minimum wage under the FLSA. (Doc. 113 at 16–23) Whether a plaintiff is an "employee" or an independent contractor depends on "the economic reality of the relationship between the alleged employee and the alleged employer and whether that relationship demonstrates dependence." *Scantland*, 721 F.3d at 1311 (quotations and citations omitted). Six "factors . . . guide[] the economic reality test":

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Scantland*, 721 F.3d at 1312. No one factor controls, and the determination depends on "the circumstances of the whole activity." *Rutherford Food*, 331 U.S. at 730. Neither "technical concepts" nor labels attached by the parties govern the inquiry.

*Scantland*, 721 F.3d at 1311. Accordingly, even a signed agreement designating the plaintiff as an independent contractor will not, by itself, control. *Rutherford Food*, 331 U.S. at 729; *Crable v. Premier Baths, Inc.*, No. 6:16-cv-1825-Orl-37TBS, 2016 WL 7188896, at *2 (M.D. Fla. Dec. 12, 2016) (Dalton, J.).

**Nature and Degree of Control**

The defendants deny "determin[ing] [the plaintiffs'] compensation, schedules, hiring, firing, recruiting, assessment of fees or penalties, or any other factor that could reasonably be construed to be control for the purposes of establishing an employment relationship." (Doc. 113 at 17) The plaintiffs contest the defendants' representation of the record and assert that the defendants controlled the plaintiffs by creating safety policies under which the plaintiffs operated; by wielding authority to suspend, fine, or disqualify the plaintiffs from transporting customers' property under the defendants' operating authority; by monitoring the plaintiffs' job progress; by establishing the plaintiffs' compensation and schedules; by prohibiting the plaintiffs from operating for another van line; by controlling the jobs available to the plaintiffs; by reprimanding the plaintiffs for declining a job; by controlling the plaintiffs' appearances; and by restricting the laborers that the plaintiffs could hire to assist with loading and unloading the trucks. (Doc. 114 at 10–13)

Several facts reveal the extent of the defendants' control over the plaintiffs. The defendants possessed power to suspend or disqualify the plaintiffs from operating under the defendants' operating authority. (Doc. 76 at 24; Doc. 113-2 at ¶ 14) The

defendants dictated the plaintiffs' appearances while the plaintiffs were with customers and even while the plaintiffs were at the Agents' headquarters. (Doc. 76 at 3–4, 29; Doc. 128-1 at ¶¶ 19–21; Doc. 136-1 at 46, 69, 74; Doc. 136-2 at 13, 24)  And the defendants appear to have restricted the laborers that the plaintiffs could hire to assist with loading and unloading the trucks. (Doc. 113-2 at ¶ 19; Doc. 136-1 at 16, 84; Doc. 136-2 at 13)

But some testimony by the plaintiffs creates uncertainty about the defendants' control.  For example, Lesperance testified that Unigroup paid him and that administrators of McCollister's directed "payroll" questions to Unigroup. (Doc. 136-2 at 5, 17–18)  But asked "who paid you," Lesperance answered, "I believe it was McCollister's."  (Doc. 136-2 at 5)  Coffman stated twice that the Agents, rather than the defendants, paid him. (Doc. 136-1 at 20, 90–91)  Further, the defendants' corporate representative testified repeatedly that the Agents, rather than the defendants, paid the plaintiffs. (Doc. 128-1 at 15–17, 21, 26, 29)  And each Agent's ICOA — even though generated from the same Unigroup template and even though subject to review by Unigroup for compliance with federal regulations — establishes a different compensation schedule. (Doc. 113-2 at ¶ 11; Doc. 113-5 at 16–21; Doc. 113-7 at 16–22; Doc. 113-8 at 29–33; Doc. 128-1 at 6–7, 16)

Additionally, the plaintiffs argue (Doc. 114 at 6–7, 12) that the defendants prevented the plaintiffs from declining work despite terms in the ICOAs allowing the plaintiffs to "refuse any specific shipment."  But the Agents, not the defendants,

- 8 -

appear to have caused that abrogation. Asked if "anyone from either United or Mayflower . . . ever t[old] you that you shouldn't be turning down shipments," Lesperance answered, "[n]ot directly, no. The [A]gent . . . gives you the narrative of everything that's . . . supposed to be done." (Doc. 136-2 at 11) Coffman testified that he attempted to refuse a job but that a dispatcher and a planner, who both worked for the Agent, expected Coffman to complete the job nevertheless. (Doc. 136-1 at 19–20, 42–43, 64–67)

In sum, the record fails to establish that the control exerted over the plaintiffs was like that commonly exerted over an independent contractor. Whether the defendants, rather than the Agents, exercised control over the plaintiffs is unclear. Stated differently, even if the plaintiffs were subject to control sufficient to suggest that the plaintiffs were "employees" as a matter of "economic reality," whether the defendants or the non-party Agents exercised that control, and were therefore the plaintiffs' "employer," remains unclear.[10] In any event, the record permits no conclusion about the nature and degree of control exerted over the plaintiffs.

**Opportunity for Profit Depending on Managerial Skill**

A worker who retains "the ability to adjust his profits based on the amount of work he did or the manner in which he managed his workload" is likely an

---

[10] The defendants argue (Doc. 113 at 23–26) that the defendants were not "joint employers" of the plaintiffs. *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012) (explaining that "an employee may have more than one employer" subject to FLSA liability). The plaintiffs, however, have never asserted joint employment; the plaintiffs have expressly disavowed joint employment theory. (Doc. 51 at 7–8; Doc. 113 at 23)

independent contractor. *Perdomo v. Ask 4 Realty & Mgmt., Inc.*, No. 07-20089-CIV, 2007 WL 9706364, at *3 (S.D. Fla. Dec. 19, 2007) (Altonaga, J.) (citing *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed.Appx. 782, 783 (11th Cir. 2006)). Both plaintiffs testified that their judgment — including decisions about route-planning, scheduling, loading, and optimizing fuel and labor expenses — affected their profits. (Doc. 136-1 at 12–13; Doc. 136-2 at 4, 17)

On the other hand, a worker is more likely an "employee" if the alleged employer determines the fee charged for services and controls the means of generating business. *Usery v. Pilgrin Equip. Co.*, 527 F.2d 1308, 1313 (5th Cir. 1978) (concluding that the plaintiffs were "employees" because the alleged employer controlled the determinants of customer volume and profit, such as "price, location, and advertising"); *Francois v. Gulf Coast Transp., Inc.*, No. 8:16-cv-1061-T-24TBM, 2017 WL2226647, at *3 (M.D. Fla. May 22, 2017) (Bucklew, J.) (declaring relevant to the plaintiff's opportunity to profit the defendant's requiring the plaintiff to charge customers a particular fee); *Armitage v. Dolphin Plumbing & Mech., LLC*, 510 F. Supp. 2d 763, 772 (M.D. Fla. 2007) (Fawsett, J.) (concluding that the plaintiff was an "employee" because the defendants offered work to the plaintiff "on a take-it-or-leave-it basis, at a given rate, and with no opportunity to negotiate"). The plaintiffs neither generated business nor negotiated the fee charged to a customer. (Doc. 113-2 at ¶ 7; Doc. 128-1 at 29) Based on the record, a reasonable jury could find either that the plaintiffs retained an ability to profit depending on their managerial skill or that

the defendants so controlled business generation that the plaintiffs were economic dependents.

**Investment in Equipment, Materials, and Labor**

Unlike an "employee," an independent contractor bears responsibility both for paying capital expenses and for hiring and paying employees. *Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876, 882–83 (C.D. Ill. 2017) (McDade, J.). The parties agree that the plaintiffs remained responsible for payments on their trucks. (Doc. 76 at 4; Doc. 113 at 6; Doc. 114 at 17) The plaintiffs paid fuel, maintenance, insurance, and cellular phone expenses. (Doc. 76 at 4; Doc. 113-2 at ¶ 17; Doc. 136-1 at 38–39; Doc. 136-2 at 12, 17) Also, the plaintiffs hired and paid laborers to assist with loading and unloading the trucks. (Doc. 76 at 4; Doc. 136-1 at 55–56; Doc. 136-2 at 13) The plaintiffs' investments favors characterizing the plaintiffs as independent contractors.

**Special Skill**

Both Coffman and Lesperance acquired a commercial driver's license. (Doc. 136-1 at 10; Doc. 136-2 at 4) Further, operating a large truck with a commercial driver's license is unquestionably a "special skill." *Luxama v. Ironbound Exp., Inc.*, No. 11-2224, 2012 WL 5973277, at *6 (D.N.J. June 28, 2012) (Salas, J.) (collecting cases); *Nichols v. All Points Transp. Corp. of Mich.*, 364 F. Supp. 2d 621, 632 (E.D. Mich. 2005) (Cleland, J.); *Bonnetts v. Arctic Exp., Inc.*, 7 F. Supp. 2d 977, 981–82

(S.D. Ohio 1998) (Marbley, J.). The plaintiffs' special skill favors characterizing the plaintiffs as independent contractors.

**Permanence**

An "employee" typically enters a work arrangement with an intention of longevity and stability. By contrast, an independent contractor tends to form a work arrangement for a defined time and might retain permission to work for others during that time. *Artola v. MRC Exp., Inc.*, No. 14-cv-23219, 2015 WL 12672722, at *9 (S.D. Fla. Sept. 25, 2012) (Seitz, J.) (citing *Keller v. Miri Microsys., LLC*, 781 F.3d 799, 807–08) (6th Cir. 2015)). The record does not resolve whether the parties intended to form an open-ended or definite working relation, and a reasonable jury could find either way.

**Performing an Integral Part of the Defendants' Business**

The defendants acknowledge that the plaintiffs' operating trucks was integral to the defendants' "moving and relocation business." (Doc. 113 at 23) The plaintiffs' integral role in the defendants' business favors characterizing the plaintiffs as "employees." *Ingram v. Passmore*, 175 F. Supp. 3d 1328, 1337 (N.D. Ala. 2016) (Kallon, J.); *Artola*, 2015 WL 12672722, at *10.

## CONCLUSION

Considered in the light most favorable to the plaintiffs, the record contains several significant factual disputes. Further, the "economic reality factors," applied as guides and considered as a whole rather than in isolation, fail to establish clearly

the defendants' entitlement to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment (Doc. 113) is **DENIED**.

ORDERED in Tampa, Florida, on July 24, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE